1

2

3

4

5

6

7                          **UNITED STATES DISTRICT COURT**

8                               **DISTRICT OF NEVADA**

9

10   DONALD SHERMAN,                    )
                                        )
11               Petitioner,            )        2:02-CV-1349-LRH-VCF
                                        )
12   vs.                                )
                                        )        **ORDER**
13   RENEE BAKER, *et al.*,             )
                                        )
14               Respondents.           )
                                        )
15   _____/

16          Before the court for a decision on the merits is an application for a writ of habeas corpus filed

17   by Donald Sherman, a Nevada prisoner sentenced to death.  ECF No. 103.

18          I.  FACTUAL AND PROCEDURAL BACKGROUND

19          On June 1, 1994, the Las Vegas Police, in response to a call from a concerned neighbor,

20   found the body of Lester Bauer (Bauer) lying face up on a blood-soaked bed in a blood-spattered

21   room of his home in Clark County, Nevada.  Bauer was the father of Sherman's ex-girlfriend Dianne

22   Bauer (Dianne).  An autopsy revealed that Bauer had died from several blows to the head with a

23   hammer sometime between the night of May 29 and the early morning of May 30, 1994.  In addition,

24   Bauer's home had been ransacked and his car was missing.

25          On June 2, 1994, Sherman was arrested in Santa Barbara, California, when the police spotted

26   Bauer's car with Sherman asleep inside.  Sherman had two credit cards belonging to Bauer and a

number of credit card receipts signed with Bauer's name.  Sherman had used Bauer's American Express card to pay for escort services in Las Vegas on May 30 and 31, 1994, and a motel room in Santa Barbara on May 31, 1994.

After being moved to Idaho on a parole revocation, Sherman was returned to Nevada to face charges arising from the Bauer murder.  On February 5, 1997, Sherman was convicted by a jury of first-degree murder, robbery, and burglary, in the Eighth Judicial District Court, Clark County, Nevada.  After a penalty hearing, the jury imposed a sentence of death, finding the following aggravating circumstances:  (1) Sherman had been convicted of another murder, (2) Sherman was under a sentence of imprisonment when he committed the murder, (3) the murder was committed during the course of a burglary, and (4) the murder was committed during the course of a robbery[1]. A judgment of conviction was entered on April 21, 1997.  Sherman appealed.

On October 27, 1998, Sherman's conviction and sentence were affirmed on direct appeal by the Nevada Supreme Court.  *Sherman v. State*, 965 P.2d 903 (Nev. 1998).  The Nevada Supreme Court denied rehearing on December 29, 1998.  On March 6, 1999, Sherman filed a petition for writ of certiorari with the United States Supreme Court.  On May 17, 1999, the Supreme Court denied that petition.

On June 7, 1999, Sherman filed a proper person petition for writ of habeas corpus with the Eighth Judicial District Court.  Approximately a year after being appointed counsel, Sherman filed, on June 27, 2000, a supplemental petition for writ of habeas corpus.  On December 12, 2000, the district court denied the petition.  Sherman appealed.  The Nevada Supreme Court affirmed the denial of relief in an unpublished order on July 9, 2002, and issued its remittitur on August 5, 2002.

On October 11, 2002, this court received Sherman's initial petition for writ of habeas corpus, which was filed in propria persona.  The court conditionally appointed the Federal Public Defender

---

[1]   The jury also found the following mitigating circumstances:  (1) that the murder was committed while Sherman was under the influence of extreme mental or emotional disturbance; (2) that Sherman acted under duress or under the domination of another person; and (3) any other mitigating circumstances.

2

(FPD) to represent Sherman on October 21, 2002, but the need to resolve potential conflicts of interest delayed permanent appointment until April 10, 2003.  On November 2, 2005, Sherman filed an amended petition for writ of habeas corpus.  Shortly thereafter, on December 12, 2005, he filed a petition for writ of habeas corpus (post-conviction) in the Eighth Judicial District Court for Nevada.  On January 3, 2006, the respondents filed a motion to dismiss the federal petition on the ground that it asserted claims not exhausted in state court.

Sherman opposed that motion, and sought a stay of the action so that he could exhaust his unexhausted claims.  On May 22, 2006, this court denied respondents' motion to dismiss and granted Sherman's motion for a stay.   The state district court dismissed the state petition on the ground that it was filed by the FPD, and not by counsel appointed in Sherman's prior state post-conviction proceedings.  Sherman successfully appealed that decision; and, on January 9, 2007, the Nevada Supreme Court remanded the case for further proceedings.

On October 22, 2007, the state district court entered an order dismissing Sherman's petition without an evidentiary hearing.  Sherman appealed.  On May 17, 2010, the Nevada Supreme Court struck two of the aggravating circumstances against Sherman (the burglary and robbery circumstances), but affirmed the denial of relief.  A petition for rehearing was denied and remittitur was issued on August 16, 2010.  On October 8, 2010, this court vacated the stay and reopened the proceedings.  On November 8, 2010, Sherman filed his second amended petition for writ of habeas corpus.

On May 23, 2011, the respondents filed a motion to dismiss the second amended petition for writ of habeas corpus arguing that all the claims in the petition are time barred by 28 U.S.C. § 2244(d) or, alternatively, that several claims are unexhausted or procedurally barred.  On March 23, 2012, this court entered an order dismissing Claims Four, Six, Seven, Eight, Ten, Twelve, Thirteen(A), Thirteen(C), Fifteen, Sixteen, Seventeen and Eighteen as procedurally barred.   The court also denied the petitioner's motion for evidentiary hearing and motion for leave to conduct discovery, but ordered additional briefing as to whether Claim Two should be dismissed as

procedurally defaulted in light of the then-recent Supreme Court opinion in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

Following supplemental briefing, this court concluded that Sherman failed to demonstrate cause pursuant to *Martinez* to overcome the state procedural bars applied to Claim Two, except for Claim Two(Y), and, therefore, dismissed all sub-claims within Claim Two, except for Claim Two(Y). The court also denied Sherman's request for discovery and an evidentiary hearing on Claim Two.

On July 19, 2013, the respondents filed their answer to Sherman's remaining habeas claims. Briefing on the merits of those claims concluded on July 19, 2014. On September 26, 2014, this court denied petitioner's motion for an evidentiary hearing and related request for leave to conduct discovery.

II.  STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme

1    Court] to the facts of a prisoner's case." *Id*. at 409.  "[A] federal habeas court may not "issue the

2    writ simply because that court concludes in its independent judgment that the relevant state-court

3    decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

4         With respect to an "unreasonable determination of the facts" under § 2254(d)(2), "[t]his is a

5    daunting standard—one that will be satisfied in relatively few cases." *Taylor v. Maddox*, 366 F.3d

6    992, 1000 (9th Cir. 2004).  It is satisfied where a state court fails to make an obvious factual finding,

7    where it makes a factual finding under an incorrect legal standard, where it plainly misapprehends or

8    misstates the record, where it ignores evidence that supports the petitioner's claim, and where the

9    fact-finding process itself is defective.  *Id*. at 1001–02.  However, the factual determinations of the

10   state court cannot be overturned unless they are "objectively unreasonable in light of the evidence

11   presented." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

12        The Supreme Court has explained that "[a] federal court's collateral review of a state-court

13   decision must be consistent with the respect due state courts in our federal system." *Id*.  The

14   "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and

15   'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766,

16   773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S.

17   19, 24 (2002) (per curiam)).  "A state court's determination that a claim lacks merit precludes federal

18   habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

19   decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S.

20   652, 664 (2004)).  The Supreme Court has emphasized "that even a strong case for relief does not

21   mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538

22   U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (2011) (describing the

23   AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court

24   rulings, which demands that state-court decisions be given the benefit of the doubt") (internal

25   quotation marks and citations omitted).

26        "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that

5

1     adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.  In *Pinholster*, the Court reasoned

2     that the "backward-looking language" present in § 2254(d)(1) "requires an examination of the

3     state-court decision at the time it was made," and, therefore, the record under review must be

4     "limited to the record in existence at that same time, i.e., the record before the state court." *Id*. at

5     182.

6            For any habeas claim that has not been adjudicated on the merits by the state court, the

7     federal court reviews the claim *de novo* without the deference usually accorded state courts under 28

8     U.S.C. § 2254(d)(1).  *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313

9     F.3d 1160, 1167 (9th Cir. 2002).  *See also James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) (noting

10    that federal court review is *de novo* where a state court does not reach the merits, but instead denies

11    relief based on a procedural bar later held inadequate to foreclose federal habeas review).  In such

12    instances, however, the provisions of 28 U.S.C. § 2254(e) still apply.  *Pinholster*, 131 S.Ct at 1401

13    ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas

14    relief."); *Pirtle*, 313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct

15    under § 2254(e)(1) even if legal review is *de novo*).

16           Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review

17    habeas claims by conducting a *de novo* review prior to applying the "contrary to or unreasonable

18    application of" limitations of 28 U.S.C. § 2254(d)(1).  *Lockyer*, 538 U.S. at 71.  In doing so,

19    however, the Court did not preclude such an approach.  "AEDPA does not require a federal habeas

20    court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) –

21    whether a state court decision is contrary to, or involved an unreasonable application of, clearly

22    established Federal law." *Id.*

23           III.  ANALYSIS OF CLAIMS

24                  **Claim One**

25           In Claim One, Sherman alleges that his constitutional rights were violated due to an order *in*

26    *limine* issued by the state trial court that had the effect of preventing him from presenting evidence of

1   Dianne's culpability in the murder of her father.  At trial, the State attempted to establish that

2   Sherman's anger toward Dianne as a result of their breakup was the reason that Sherman drove from

3   Washington state to Las Vegas and killed Bauer.  The theory the defense sought to advance was that,

4   when Sherman entered Bauer's house, he intended only to confront Bauer about allegations of sexual

5   molestation involving Dianne and her daughter, and that only after he was inside the house did he

6   lose his temper and kill Bauer, at least partially due to the fact that he was under the influence of

7   drugs.  Another component of this defense theory was that Dianne, eager to collect an inheritance

8   from her father, manipulated Sherman into the confrontation by playing upon his hypersensitivity

9   regarding child abuse.  Sherman contends that the trial court erred in preventing him from presenting

10  testimony that Dianne had told people, including Sherman, that her father had molested her and that

11  she was looking forward to his death so she could collect an inheritance.

12        Just prior to the presentation of defense witnesses at Sherman' trial, the prosecution made an

13  oral motion *in limine* asking the trial court to exclude testimony as to whether Dianne had told

14  people that her father had molested her and testimony from a witness to an interaction between

15  Dianne and Sherman on an Alaska roadway that Dianne had described during her testimony for the

16  State.[2]  The prosecution argued that the testimony was inadmissible under state law because it was

17  extrinsic evidence intended to impeach Dianne's testimony about collateral matters.  In response,

18  defense counsel argued that the issues were not collateral matters because they would undermine the

19  State's theory of Sherman's motive and support Sherman's defense theory.  The trial court agreed

20  with the prosecution and ruled that the testimony was inadmissible.  Defense counsel then, as an

21  offer of proof, gave a detailed summary of the testimony they intended to elicit from various

22

23  _____

      [2]  The Nevada Supreme Court described this latter incident in the following manner:

24        After Sherman and Dianne broke up in January 1994, both moved to Alaska. One

25  evening as Dianne was driving home, she saw Sherman in a car with another woman.
      Sherman looked at Dianne and pantomimed shooting a gun.  Dianne flipped him off and,

26  upset by the confrontation, pulled off the highway.

*Sherman*, 965 P.2d at 906.

1  witnesses.

2      In the penalty phase of the trial, Sherman presented several witnesses who testified about

3  comments Dianne had made regarding her animosity toward her father, inheriting her father's

4  money, and alleged sexual abuse.  Thus, it does not appear that the challenged order *in limine* was in

5  effect in the penalty phase.  Sherman claims that the court ruled, off the record, that it would permit

6  the defense to offer evidence of statements Dianne made on those subjects, but not if they were made

7  in Sherman's presence.

8      In his direct appeal, Sherman argued to the Nevada Supreme Court that the trial court erred in

9  preventing him from presenting evidence designed to impeach Dianne's testimony and, as a result,

10  deprived Sherman of his constitutional right to present a defense.  ECF No. 131-8, p. 31-37, ECF

11  No. 131- 15, p. 8-14.[3]  The Nevada Supreme Court addressed that argument as follows:

12      Sherman argues that the trial court erred when it excluded testimony regarding
        Dianne's relationship with her father which, he argues, would have shown a lesser
13      degree of culpability on his part.  We conclude that this argument is meritless.

14      Extrinsic evidence of specific instances of conduct may not be used to attack
        the credibility of a witness; however, such instances are properly the subject of
15      cross-examination.  *Rembert v. State*, 104 Nev. 680, 683, 766 P.2d 890, 892 (1988);
        NRS 50.085(3).  In addition, it is within the sound discretion of the trial court to
16      exclude evidence which is otherwise admissible if its probative value is substantially
        outweighed by the danger of confusing the issues or misleading the jury.  *Kazalyn v.*
17      *State*, 108 Nev. 67, 71, 825 P.2d 578, 581 (1992); NRS 48.035(1).  This court will not
        set aside the district court's ruling to admit or exclude evidence unless it is manifestly
18      wrong.  *Petrocelli v. State*, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985).

19      In this case, defense counsel asked Dianne on cross-examination whether she
        had told anyone that she resented her parents for placing her in a reform school,
20      whether she had ever told anyone that her father had molested her, and whether she
        sought to manipulate her father for personal financial gain.  Dianne testified that she
21      had never said or done these things.  Sherman sought to introduce the testimony of
        certain witnesses who would testify that Dianne had told them that her father had
22      molested her as a child, that she disliked and resented him, and that she was eager to
        obtain an inheritance from him.  In addition, Sherman sought to introduce testimony
23      that the Alaska highway incident did not occur as Dianne said it did.  The State
        moved to exclude this evidence. The district court granted the State's motion on the
24      grounds that this evidence was relevant only as a collateral attack on Dianne's
        credibility as a witness.

25

26  ────────────────

    [3]  References to the court's electronic record herein are based on CM/ECF pagination.

8

1
2
3
4
5
6

Sherman argues that this testimonial evidence, rather than simply attacking Dianne's credibility as a witness, tended to support his theory of the case. Sherman's argument here is somewhat confusing, but he seems to contend that had he been able to adduce this testimony at trial, the jury could have found that he lacked the level of intent required for first degree murder. Dianne, Sherman posits, had somehow provided the impetus for him to make the trip to Las Vegas by playing upon his feelings about child abuse. Sherman contends that at the time he entered Bauer's house, he intended only to talk to Bauer about Bauer's relationship with Dianne; only after he was inside the house did he lose his temper. Sherman argues that had he been able to develop more fully this theory, the jury may have found him guilty of only second degree murder.

7
8
9
10

When Sherman made this argument before the district court, it implicitly found that the evidence was not relevant for any purpose other than impeachment or that any relevancy the testimony had toward proving Sherman's theory was substantially outweighed by the risk of misleading the jury or confusing the issues. After a thorough review of the record, we conclude that this determination was not manifestly wrong and that, therefore, the district court did not abuse its discretion in excluding it.

11
12
13
14
15
16

Furthermore, even if the evidence was wrongly excluded, this constitutes harmless error. Sherman was able to argue this theory extensively during closing argument. While the jury found Sherman guilty of first degree murder, they also found, as a mitigating factor, that he acted under duress or domination of another person, presumably Dianne. Notwithstanding this mitigator, the jury sentenced him to death. Thus, the jury implicitly found that Sherman was manipulated by Dianne, but that this manipulation did not significantly reduce his culpability in the matter. Therefore, we conclude that even had the evidence at issue been presented at trial, the jury would not have found that Sherman was either innocent or guilty of a lesser included offense.

17 *Sherman*, 965 P.2d at 909-10 (footnote added).

18    In presenting Claim One to this court, Sherman has supplemented his claim with factual

19 allegations and proposed evidence that was not before the Nevada Supreme Court in his direct

20 appeal. Sherman has proffered declarations from several witnesses setting forth the testimony that

21 they would have allegedly offered at trial if given the chance. In addition, Sherman alleges that the

22 trial court erred by preventing the defense from using notes from Bauer's estate file showing that he

23 was making plans to exclude Dianne from his will at the time of his death. According to Sherman,

24 that information would have corroborated the theory that Dianne wanted her father dead before he

25 had the opportunity to change his will.

26    Sherman argues that the Nevada Supreme Court's decision is "contrary to" clearly

9

1    established law in *Skipper v. South Carolina*, 476 U.S. 1 (1986), and *Crane v. Kentucky*, 476 U.S.

2    683 (1986), regarding his constitutional right to rebut the State's evidence and to present a complete

3    defense to the charges against him.  In *Skipper*, the Court held that the state trial court violated the

4    petitioner's right to present relevant evidence in mitigation of punishment when it excluded the

5    testimony of jailers and a regular visitor regarding petitioner's good behavior during the time he

6    spent in jail awaiting trial.  *Skipper*, 476 U.S. at 4-5.  In *Crane*, the Court held that the defendant was

7    deprived of his constitutional right to a fair trial because the trial court excluded testimony about the

8    circumstances of the defendant's confession on the ground that such testimony pertained only to the

9    issue of voluntariness, which had been resolved against the defendant in a pretrial ruling.  *Crane*,

10   476 U.S. at 690-91.  According to Sherman, these cases stand for the proposition that the application

11   of an otherwise valid state evidentiary rule is unconstitutional if it prevents a defendant from

12   presenting a defense.

13       For additional support, Sherman cites to *Ake v. Oklahoma*, 470 U.S. 68 (1985) and *Holmes v.*

14   *South Carolina*, 547 U.S. 319 (2006).  In *Ake*, the Court held that, as a matter of due process, the

15   petitioner was entitled to access to a psychiatrist's assistance at his trial given that his mental state at

16   the time of the offense was a substantial factor in his defense and his future dangerousness was a

17   significant factor at the sentencing phase.  *Ake*, 470 U.S. at 86-87.  In *Holmes*, the Court held that the

18   defendant's right to have a meaningful opportunity to present a complete defense was violated by the

19   application of a state evidentiary rule that, in this particular case, excluded defense evidence about a

20   third party's alleged guilt because there was strong evidence of the defendant's guilt.  *Holmes*, 547

21   U.S. at 331.

22       For the reasons that follow, the foregoing Supreme Court cases do not require this court to

23   conclude that Nevada Supreme Court's decision is not worthy of deference under § 2254(d).  The

24   Court in both *Crane* and *Holmes* recognized the "broad latitude" state courts have under the

25   Constitution in excluding evidence from criminal trials.  *Holmes*, 547 U.S. at 324; *Crane*, 476 U.S.

26   at 690.  Evidentiary rules or decisions do not violate a defendant's constitutional rights unless they

1    "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the

2    purposes they are designed to serve." *Holmes*, 547 U.S. at 324 (alteration in original) (internal

3    quotation marks omitted).  The Court in *Crane* concluded that the exclusion of testimony about the

4    circumstances of the defendant's confession violated the defendant's constitutional right to present a

5    defense because it was "competent, reliable evidence" that was "central to the defendant's claim of

6    innocence" and the State had failed to advance "any rational justification for the wholesale exclusion

7    of this body of potentially exculpatory evidence." *Crane*, 476 U.S. at 690-91.  Likewise, the Court

8    in *Holmes* invalidated the evidentiary rule applied in that case because it "is 'arbitrary' in the sense

9    that it does not rationally serve the end that . . . third-party guilt rules were designed to further" and

10   the State has not "identified any other legitimate end that the rule serves." *Holmes*, 547 U.S. at 331.

11           Unlike the evidence at issue in *Crane* and *Holmes*, the excluded evidence here was of limited

12   exculpatory value.  While it may have undermined the State's theory as to motive, it would have also

13   provided an alternate motive that did not necessarily reduce Sherman's culpability on the charge of

14   first degree murder.  Moreover, the state court's use of Nev. Rev. Stat. § 50.085(3) to exclude the

15   evidence was not arbitrary or disproportionate to the purpose the rule is designed to serve.  "The

16   purpose of [the] rule, the Nevada Supreme Court has explained, 'is to focus the fact-finder on the

17   most important facts and conserve "judicial resources by avoiding mini-trials on collateral issues."'"

18   *Nevada v. Jackson*, 133 S. Ct. 1990, 1993 (2013) (quoting *Abbott v. State*, 138 P.3d 462, 476 (Nev.

19   2006) (quoted source omitted)).  The record demonstrates that the trial court was attempting to

20   further that purpose when it excluded Sherman's proposed evidence.  ECF No. 129-10, p. 12-30.

21   And, the questionable value of the evidence to Sherman's defense undermines the argument that the

22   exclusion of the evidence was disproportionate to the interest being served.

23           The holding in *Skipper* is based squarely on the Court's prior holdings in *Lockett v. Ohio*,

24   438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982).  *See Skipper*, 476 U.S. at 3.  It

25   addressed the narrow issue of whether the petitioner, as a defendant in a capital case, had been

26   deprived of "right to place before the sentencer relevant evidence in mitigation of punishment." *Id*.

11

at 4.  That holding has no bearing on whether the Nevada Supreme Court's decision excerpted above

is "contrary to . . .  clearly established Federal law, as determined by the Supreme Court."  *See Moses*

*v. Payne*, 555 F.3d 742, 756 n.4 (9th Cir. 2009) (noting that *Skipper* was inapposite to the question

whether the trial court's evidentiary rulings deprived him of his due process right to rebut arguments

presented by the state because it "pertain[s] to the unique context of capital sentencing

proceedings").  While Sherman relies heavily on the reasons the Court in *Skipper* gave for rejecting

the State's arguments as to why the exclusion of the evidence was not erroneous (ECF No. 210, p.

25-27), those reasons do not "constitute clearly established law for purposes of § 2254" for the

purposes of § 2254(d).  *See House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) (explaining "that

Supreme Court holdings – the exclusive touchstone for clearly established federal – must be

construed narrowly and consist only of something akin to on-point holdings").

Similarly, *Ake* is, at most, tangentially applicable to the issue presented here.  The crucial

holding in *Ake* is "that when a defendant has made a preliminary showing that his sanity at the time

of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide

access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one."  *Ake*,

470 U.S. at 74.  The case does not involve, as Sherman argues, "the arbitrary application of a state

evidence rule in circumstances that prevented the defendant from presenting a defense to the State's

evidence and arguments."  ECF No. 210, p. 32.

Even if the Nevada trial court's evidentiary ruling violated Sherman's constitutional right to

present a defense, such error is subject to harmless error analysis (*Crane*, 476 U.S. at 691), meaning

that a Sherman would be entitled to habeas relief only if the error has a "substantial and injurious

effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637

(1993).  This court is not convinced that the trial court's order *in limine* had such an impact in this

case.

Overwhelming evidence was presented at trial that Sherman murdered Bauer, deliberately

and with premeditation.[4]  *See Sherman v. State*, 965 P.2d 903, 906-07 (Nev. 1998) (recounting evidence presented at trial regarding circumstances surrounding the murder).  Sherman does not allege, in relation to Claim One, that Dianne actively participated in the murder.  Even if this court were to overlook *Pinholster* and consider Sherman's newly proffered evidence, the evidence would, at most, establish that Dianne emotionally manipulated Sherman into committing the murder, which does not undermine, in any way, the jury's verdict of first degree murder.  The trial court's order *in limine*, if error, was harmless error.

With respect to the penalty phase, Sherman was permitted to present several witnesses who testified about Dianne's relationship with Sherman and with her father.[5]  ECF No. 130-3 through 130-9.  These witnesses recounted Dianne's ability and propensity to manipulate Sherman.  *Id*.  They also provided testimony about comments she had made regarding her animosity toward her father, inheriting her father's money, and alleged sexual abuse.  *Id*.

In addition, Dr. Stephen Pittel, a psychologist, testified for the defense in the penalty phase and, in the course of that testimony, recounted the circumstances of the crime as related to him by Sherman.  No. 130-7, p. 42-43.  According to that account, Sherman went to Bauer's house twice on the day of the murder.  The first visit started as a "cordial conversation," but ended with Bauer kicking Sherman out of the house when Sherman brought up the subject of child abuse.  Then, later that night, in a rage fueled by alcohol and methamphetamine, Sherman returned to Bauer's house and killed him.  Dr. Pittel further testified that he had no doubt that, whether or not Dianne had been abused by her father, Sherman believed that she had been and that Sherman harbored extreme negative feelings against Bauer because Sherman believed him to be child abuser.  ECF No. 130-9, p. 26.  Dr. Pittel also testified that he was able to establish, based on corroborating evidence, that

---

[4] Alternatively, the jury could have found Sherman guilty of first degree murder based on the felony murder rule inasmuch as the jury found him guilty of both robbery and burglary.  There is no doubt that Sherman killed Bauer in the perpetration of a robbery and/or burglary.

[5] As noted above, Sherman claims that the trial court's ruling with respect to the penalty phase was that the defense was permitted to present evidence of Dianne's statements to others about her father, but not if they were made in Sherman's presence.

1   Dianne manipulated and controlled Sherman.  *Id*., p. 27-28.

2        The jury found, as mitigating circumstances, that Sherman committed the murder while under

3   the influence of extreme mental or emotional disturbance and that he acted under duress or under the

4   domination of another person.  ECF No. 130-13, p. 5-6.  Thus, the jury gave credence to the

5   defense's theory that Dianne had manipulated him and that Sherman was distraught and/or under the

6   influence of drugs at the time of the murder.  Even so, the jury still imposed the death penalty.  Thus,

7   any error arising from the trial court's exclusion of Diane's statements in the penalty phase was

8   harmless error.

9        Ground One is denied.

10                  **Claim Two(Y) and Five**

11       In Claim Five, Sherman alleges that his constitutional rights were violated by improper

12  comments made by the trial judge during jury selection.  Sherman cites to remarks in which the

13  judge indicated that the Bible condones the death penalty as a form of punishment and to what

14  Sherman claims was disparate questioning between death-scrupled and life-scrupled jurors.[6]  In

15  Claim Two(Y), Sherman alleges that he was deprived of effective assistance of counsel due to his

16  trial counsel's failure to object to the improper comments.

17       According to Sherman, the trial judge's misconduct "skewed the composition of the jury

18  towards a tribunal that was organized to return a verdict of death and contaminated the jurors . . .

19  with inflammatory, irrelevant, and prejudicial information that was contrary to the state law

20  sentencing scheme in capital cases and a violation of the Eight Amendment right to a reliable

21  sentencing determination."  ECF No. 210, p. 79.  As support for his claim for relief, he cites to

22  several cases that address the mechanics of selecting a jury in a capital case (*Witherspoon v. Illinois*,

23  391 U.S. 510 (1968); *Wainwright v. Witt*, 469 U.S. 412 (1985); *Morgan v. Illinois*, 504 U.S. 719

24

25          [6]  He also contends that the trial judge improperly told members of the venire that premeditation

26  does not require any planning and that they had no individual responsibility when issuing a verdict in
    the penalty phase.  ECF No. 103, p. 243-45.  However, the remarks he cites are so fleeting or ambiguous
    that their impact on potential jurors would be negligible.

1   (1992); and *Uttecht v. Brown*, 551 U.S. 1 (2007)) and several that speak to the requirements of a

2   state's statutory scheme for imposing the death penalty (*Furman v. Georgia*, 408 U.S. 238 (1972);

3   *Gregg v. Georgia*, 408 U.S. 153, 189 (1976); and *Godfrey v. Georgia*, 446 U.S. 420 (1980)).  ECF

4   No. 210, p. 80-81.  In none of these cases, however, did the Court address whether an Eighth

5   Amendment violation may result from a trial judge's comments to the venire during jury selection.

6        Absent here is an identifiable violation of the principles outlined in *Witherspoon*, *Witt*, and

7   *Uttecht*, either by the exclusion of a qualified potential juror on impermissible grounds or by the

8   selection of a juror who is substantially impaired in his or her ability to follow the law.  *See Uttecht*,

9   551 U.S. at 9 (listing main principles set forth in *Witherspoon* and *Witt*).  Likewise, Sherman has not

10  established that the voir dire in his case failed to inquire into the prospective jurors' views on capital

11  punishment in a manner that was not "constitutionally sufficient," as contemplated in *Morgan*.  *See*

12  *Morgan*, 504 U.S. at 736 (holding that State must allow inquiry into whether a potential juror would

13  automatically impose the death penalty upon conviction of the defendant).  Moreover, there is no

14  evidence that the alleged disparate questioning of life-scrupled potential jurors versus death-scrupled

15  juror resulted in the selection of an impartial jury.

16       Sherman attributes significant weight to the Nevada Supreme Court's determination that the

17  trial court's reference to religious authority was inappropriate.  Addressing Sherman's claim that

18  counsel rendered ineffective assistance by not objecting to the comments, the Nevada Supreme Court

19  decided as follows:

20          Appellant next contends that his trial and appellate counsel should have
        challenged comments made by the trial judge during voir dire.  During collective voir

21      dire, a potential juror indicated that she would have difficulty imposing a death
        sentence due to her religious convictions.  The trial judge advised the juror, "in the

22      Bible, it was very common to have this form of punishment.  As a matter of fact, the
        Book of Judges … this is the way this form of punishment was carried out."  The

23      juror reiterated that she would feel uncomfortable imposing a death sentence.  The
        trial judge then commented that everyone involved in the proceedings felt

24      uncomfortable and stated that he had "done it on a few occasions," and the "always
        felt uncomfortable.  That isn't the question."  Appellant argues that the trial judge

25      improperly opined that the Bible "specifically permits the death penalty" and, even
        more improperly, that he believed a death sentence "was a correct avenue for

26      punishment pursuant to the Bible," from which the judge was able to quote.
        Appellant concludes that he was prejudiced because jurors would afford more weight

1  to the judge's comments and less weight, if any, to the instructions.  At oral argument
2  on this issue, appellant characterized the trial judge as stating, "you can execute
   [appellant], and if you feel bad about it under Nevada Law, under the Book of Judges
3  you can do it too."  Appellant acknowledges that this is an issue of first impression in
   Nevada, but cites Ginnis v. Mapes Hotel Corp., [fn: 86 Nev. 408, 470 P.2d 135
   (1970).] Sandoval v. Calderon [fn: 241 F.3d 765 (9th Cir. 2001).] and Agee v.
4  Laughlin [fn: 287 F.2d 709 (8th Cir. 1961).] in support of this claim.

5          While the judge's reference to religious authority for capital punishment was
   inappropriate, [fn: Cf. Sandoval, 241 F.3d at 775-76 (holding that the prosecutor's
6  invoking religious authority to justify imposition of a death sentence at the close of
   the penalty phase was improper).] we conclude that appellant was not prejudiced.
7  First, it was clear at voir dire that the judge's comments were limited to determining
   whether the juror could consider the death penalty as a possible form of punishment.
8  [Fn: See Wainwright v. Witt, 469 U.S. 412, 424 (1985) (holding that, in a capital
   case, jurors must be capable of considering a death sentence); see also Aesoph v.
9  State, 102 Nev. 316, 318, 721 P.2d 379, 380-81 (1986).]  For example, after the judge
   commented that everyone involved "felt uncomfortable" but that was not the
10 question, he continued, "The question is: Will you consider the forms of punishment
   or not?"  Nor did the judge encourage the juror to return a death sentence, as appellant
11 implies. When the juror said, "The death penalty would be a difficult choice for me,"
   the judge responded, "Absolutely.  It should be; it should be."  Second, the record
12 belies appellant's concern that the jury was unduly influenced by the judge's
   comments.  The judge ultimately excused the prospective juror when she
13 acknowledged that she could not impose the death penalty under any circumstances.
   Further, another prospective juror questioned shortly thereafter stated that she could
14 not consider the death penalty due to her religious beliefs.  Finally, none of the cases
   cited by appellant support his argument.  We therefore conclude that appellant is not
15 entitled to relief because he has failed to demonstrate that he was prejudiced by his
   counsel's failure to challenge the trial judge's remarks.

16

17 ECF No. 133-20, p. 8-10.

18          Sherman's arguments notwithstanding, the Nevada Supreme Court's decision does not

19 support federal habeas relief.  To begin with, the Nevada Supreme Court's reliance on *Sandoval* did

20 not equate to a finding that Sherman's constitutional rights had been violated as a result of the trial

21 judge's comments.  Instead, the state supreme court merely compared the comments to those made

22 by the prosecutor in *Sandoval* in determining that the comments were "inappropriate."

23          More importantly, the comments at issue here are not comparable to those in *Sandoval* with

24 respect to prejudicial impact.  In *Sandoval*, the prosecutor told the juror in closing argument after the

25 penalty phase "that God sanctioned the death penalty for people like Sandoval who were evil and

26 have defied the authority of the State" and "that by sentencing Sandoval to death, the jury would be

16

1   'doing what God says.'" *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000).  The prosecutor

2   "added that imposing the death penalty and destroying Sandoval's mortal body might be the only way

3   to save Sandoval's eternal soul." *Id*.  Here, by contrast, the trial judge did not invoke God to

4   advocate for the death penalty.  Instead, he briefly mentioned the Bible in the context of addressing

5   the religion-based qualms about the death penalty expressed by two potential jurors.

6          Turning to Sherman's claim of ineffective assistance of counsel, the Supreme Court has

7   propounded a two prong test for analysis of such claims: a petitioner claiming ineffective assistance

8   of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective

9   standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the

10  defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors,

11  the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668,

12  688, 694 (1984).  The Nevada Supreme Court was applying the *Strickland* standard in the excerpt

13  above.  ECF No. 133-20, p. 3.

14         Sherman argues that the court's determination that he did not satisfy the prejudice prong was

15  an unreasonable application of the standard.  However, his contention that the trial judge's

16  comments tainted the jurors who rendered the sentencing verdict in his case is highly speculative and

17  not supported by the record.  Accordingly, fair-minded jurists could certainly disagree as to whether

18  the comments gave rise to a reasonable probability of a different sentencing result.  *See Strickland*,

19  464 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable

20  effect on the outcome of the proceeding.").  That is sufficient to require this court's deference to the

21  Nevada Supreme Court's decision.  *See Richter*, 562 U.S. at 101.  In addition, the voir dire

22  comments included in Claim Five that were not presented to the Nevada Supreme Court do not alter

23  that result.

24         Claims Two(Y) and Five are denied.

25                 **Claim Three**

26         In Claim Three, Sherman alleges that the State failed to disclose material exculpatory and

impeachment evidence generated by the Longview Police Department (Longview, Washington) and, in relation to that, intentionally elicited false testimony from Dianne Bauer.  He also alleges that the State failed to disclose evidence of benefits received by State's witnesses (Michael Placencia, Christine Kalter, and Stacey Maher) and records from the Sandpoint Police Department pertaining to Sherman's prior murder conviction in Idaho.

A prosecutor's obligation to disclose information favorable to the defense is well-established under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).  As explained by the Ninth Circuit Court of Appeals in *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997):

> The prosecution is obligated by the requirements of due process to disclose material exculpatory evidence on its own motion, without request.  *See Kyles v. Whitley*, 514 U.S. 419, 432-34 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Evidence is material, and must be disclosed, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles*, at 433; *Bagley*, 473 U.S. at 682.  A "reasonable probability" does not require showing by a preponderance that the outcome would have been different.  *See Kyles*, at 433-35.  Rather, a " 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.
>
> Material evidence required to be disclosed includes evidence bearing on the credibility of government witnesses.  *See Bagley*, 473 U.S. at 676; *Giglio*, 405 U.S. at 154-55. . . . (Parallel citations omitted).

*Carriger*, 132 F.3d at 479.

1. *The Longview Police Department / Diane Bauer evidence*

According to Sherman, the prosecution was in actual and constructive possession of records from the Longview Police Department (LPD) that show that the state elicited false testimony from Dianne on direct examination that she contacted the Longview authorities to warn them that her father was in danger.  Sherman also claims that the records contain statements by witnesses Erin Murphy and Tyna McNeill that undermine the State's theory of motive and support the theory that Dianne planned to kill her father because she was about to be cut out of his will.

In addressing this aspect of Claim Three in Sherman's second state post-conviction proceeding, the Nevada Supreme Court concluded as follows:

1    Sherman identifies as <u>Brady</u> material the following evidence related to
2    Dianne:  (1) evidence showing that Dr.Bauer intended to exclude Dianne from his
     estate and that Dianne was aware of her father's objective, (2) files from a police
3    department in Washington purportedly revealing that Dianne intended to kill her
     father before he changed his will and that she testified falsely about calling the police
4    department to warn officers that Dr. Bauer was in danger, (3) evidence showing
     Dianne was culpable in her father's death, and (4) the State did not correct Dianne's
5    trial testimony regarding her involvement in her father's murder.  However, we
     conclude that this evidence was either discoverable with the exercise of reasonable
6    diligence, or not material in that its absence did not cause prejudice.

7    ECF No. 140-12, p. 4 (citations to Nevada case law omitted).

8        The records from the Longview Police Department that Sherman has presented to this court

9    (1) contain no indication that Dianne contacted the LPD about her father being in danger and (2)

10   contain the aforementioned statements by Murphy and McNeill.  ECF No. 110-5, p. 17-34.

11   Moreover, the State does not dispute that LPD records were in the actual or constructive possession

12   of the prosecutor.  This court is not convinced, however, that evidence that Dianne lied about

13   contacting the FBI and LPD or that she wanted her father dead would serve to "undermine[]

14   confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (citation omitted).  As discussed

15   above in relation to Ground One, the improper exclusion of evidence that Dianne manipulated

16   Sherman into committing the murder would have been harmless error under *Brecht*.  Accordingly,

17   the prosecutor's failure to disclose such evidence is not material under *Brady/Bagley*.  *See Kyles*, 514

18   U.S. at 436 (explaining that the *Brady* materiality standard imposes a higher burden on the defendant

19   than a showing that the error was not harmless under *Brecht*).

20       2.  *State's witnesses*.

21       Placencia and Kalter were jailhouse informants who provided information about Sherman's

22   plan to escape from jail, which included solicitation to commit murder.  Kalter testified in the

23   penalty phase of Sherman's trial.  Placencia was not called as a witness, but a sergeant with the Las

24   Vegas police, Gayland Hammack, testified about information that Placencia had provided to the

25   police.  ECF No. 130-3, p. 7-30.  Maher testified in the guilt phase about providing the escort

26   services for Sherman on May 30 and 31, 1994.  ECF No. 129-5, p. 44-61; ECF No. 129-6, 2-10.

19

1    Sherman alleges that the State suppressed information relating to *quid pro quo* benefits

2    received by Placencia (specifically, favorable treatment with respect to then-pending criminal

3    matters) in exchange for his cooperation, and also information regarding prior felony convictions,

4    that could have been used for impeachment purposes.  With respect to Kalter, Sherman claims that

5    the State failed to disclose that she was a paid undercover informant for the narcotics division of the

6    Las Vegas police department and that law enforcement officers viewed her as a violent drug abuser

7    who was mentally unstable.  Finally, Sherman claims that the State misrepresented the nature and

8    extent of favorable treatment accorded Maher in relation to pending prostitution charges and failed to

9    disclose that Maher had had her criminal records sealed.

10    In addressing this aspect of Claim Three in Sherman's second state post-conviction

11    proceeding, the Nevada Supreme Court concluded as follows:

12          Sherman contends that the State withheld <u>Brady</u> material related to two
          jailhouse informants and another prosecution witness and presented false testimony
13          regarding these witnesses.

14          Sherman's claim regarding the jailhouse informants relates to evidence the
          State introduced in the penalty hearing concerning Sherman's plot to escape
15          detention, which included the killing of two correctional officers, another individual,
          and one of the informants.  In particular, Sherman contends that the State failed to
16          disclose information related to the informants' criminal histories and benefits they
          received in exchange for their cooperation in the investigation of Sherman's escape
17          plan.  Although the State improperly withheld information concerning the informants'
          criminal histories, the disclosure of that information would not have altered the
18          outcome of the penalty hearing in light of the overwhelming evidence supporting
          Sherman's involvement in planning his escape.  As to the benefits the informants
19          received, nothing in the documents Sherman submitted shows that any favorable
          treatment in the disposition of any pending criminal case against them was related to
20          their cooperation in the investigation of Sherman's escape plot.

21          As to the prosecution witness, Sherman argues that the State withheld
          evidence concerning benefits she received related to the disposition of criminal
22          charges, quashing of bench warrants, and sealing of criminal records.  However, trial
          counsel cross-examined her regarding benefits she received after becoming a
23          prosecution witness, including that the prosecutors assisted her in quashing a warrant
          and securing her release from jail on her own recognizance on unrelated charges.  As
24          to Sherman's claim related to the sealing of records, nothing in his submissions
          clearly indicates that the witness' criminal records were sealed or, if they were, that it
25          was a result of her assistance in Sherman's prosecution.

26    ECF No. 140-12, p. 5.

Kalter's testimony and the information Palencia provided were corroborated by a wealth of other evidence. To begin with, Palencia provided detectives with written instructions regarding the escape plans and murder plot. ECF No. 130-3, p. 11-13. A handwriting expert confirmed that the instructions had been written by Sherman. *Id.* The State also introduced the transcript of a wiretap recording of Sherman discussing the escape plans with Placencia. *Id.*, p. 14-15. In addition, the State presented letters that Sherman had written to Kalter, who had befriended Sherman while they were in jail together. *Id.*, p. 19-20. Those letters were also confirmed by a handwriting expert to have been written by Sherman. *Id.* Also, the letters, which Kalter received after she had been released from jail, contain information consistent with information provided by Palencia regarding the escape plan. *Id.*, p. 52-55. Given strength of this corroborating evidence, Sherman's allegations about inducements or benefits allegedly received by Placencia and Kalter, even if true, would not undermine this court's confidence in the outcome of Sherman's trial.

In a letter dated December 31, 1996, the prosecutor notified Sherman's counsel that, after the grand jury proceedings in Sherman's case, Maher had contacted him from jail after being arrested for prostitution and that he had been able to obtain for her an own-recognizance release. ECF No. 114-10, p. 29. The letter further stated that that was the only benefit Maher had received from the State. *Id.* Sherman contends that Maher's testimony at trial establishes that the State provided additional benefits in relation to a bench warrant in a loitering case that the State did not disclose. Sherman has not shown, however, that Maher received any benefits from the State prior to her grand jury testimony. And, her trial testimony does not differ significantly from her testimony in that earlier proceeding. ECF No. 125-5, p. 46-53; ECF No. 125-6, p. 2-11.

Moreover, Maher's testimony was also corroborated by other evidence. The receptionist for the escort service testified at Sherman's trial about receiving a phone call from Sherman on May 30, 1994, and dispatching Maher to his motel room. ECF No. 129-5, p. 30-44. She further testified that approximately an hour later Maher called her from the room with a credit card number and indicated that the name on the card was Dr. Lester E. Bauer. *Id.* Testimony from the a Santa  Barbara police

officer established that, when arrested, Sherman had Dr. Bauer's credit cards in his possession, including the one Sherman used to pay for Maher's services.  ECF No. 129-6, p. 27.  Thus, here again, Sherman cannot show that any undisclosed evidence related to Maher was material for the purposes of establishing a *Brady* violation.[7]

   3. *Idaho murder conviction evidence.*

With regard to the Idaho murder conviction, the State presented evidence in the penalty phase that Sherman shot and killed a grocery store clerk in 1981 in the course of a burglary and attempted robbery.  Sherman, who was seventeen years old when that murder was committed, claims that evidence from the Sandpoint Police Department shows that his accomplice, who was four years older than him, played a greater role in the crime than portrayed by the State's witness (Andrew Anderson, a Sandpoint police detective) in the penalty phase.  Specifically, Sherman claims that the evidence would have shown that the accomplice was in the store at the time of the shooting (contrary to Anderson's testimony based on the accomplice's statement that he was waiting outside) and that Anderson testified falsely that the confidential informant who corroborated the information provided by the accomplice was "a business person in the community" when, in fact, the informant had received the information from the accomplice himself.[8]  ECF No. 210, p. 72.

In addressing this aspect of Claim Three in Sherman's second state post-conviction proceeding, the Nevada Supreme Court concluded as follows:

> Sherman contends that the State withheld <u>Brady</u> material regarding his prior murder conviction in Idaho that would have shown his diminished culpability in that murder relative to his co-defendant, who was older and more criminally sophisticated. Even assuming any improper withholding of evidence in this regard, Sherman failed to demonstrate prejudice considering he was the individual who shot the victim three times during a robbery.

ECF No. 140-12, p. 6.

---

   [7]   With respect Sherman's allegations regarding Maher's records being sealed, he has failed to establish that there is any link between that occurrence and Maher's testimony at Sherman's trial.

   [8]   Sherman's second amended petition also alleges that available evidence shows that the accomplice "was likely the actual shooter of the grocery clerk."  ECF No. 103, p. 145.

22

1    In the penalty phase, the defense presented the testimony of Philip Robinson, the prosecuting

2    attorney who prosecuted the Idaho murder case.  ECF No. 130-6, p. 13-51.  Robinson's testimony

3    established that Sherman's accomplice and possibly the accomplice's father, both of whom were

4    more criminally sophisticated than Sherman, had come up with the plan for the crime and provided

5    Sherman with the murder weapon.  *Id*.  Robinson also testified that his office's investigation showed

6    that Sherman was likely in a state of panic when he fired the shots that killed the clerk.  *Id*.

7    Moreover, Sherman's allegations about the accomplice being in the store at the time of the

8    shooting are belied by Sherman's own testimony at his sentencing hearing on the Idaho conviction.

9    ECF No. 58, p. 236-62.  In that testimony, Sherman stated that hid in the bathroom of the store for a

10   half hour until the clerk had closed the store and was preparing to leave.  *Id*.  He further stated that

11   he surprised the clerk when he emerged from the bathroom, then shot the clerk when the clerk threw

12   a set of keys at him then came towards him.  *Id*.  He also confirmed that his accomplice had waited

13   in the van parked "somewhere away from the [store]" during the robbery.  *Id*.

14   In light of the foregoing, the records from the Sandpoint Police Department are not material

15   evidence, so their alleged non-disclosure does not establish a constitutional violation.

16   Sherman advances several reasons why this court's review of Ground Three should be *de*

17   *novo*, with no deference afforded the Nevada Supreme Court's decision.  For the reasons set forth

18   above, however, the claim fails even when subjected to *de novo* review.  This court also rejects

19   Sherman's argument that the cumulative effect of undisclosed evidence establishes a *Brady*

20   violation.  It is true that the court, in determining materiality, must consider the suppressed evidence

21   "collectively, not item by item."  *Kyles*, 514 U.S. at 436.  However, with respect to the guilt phase,

22   the State's alleged failure to disclose evidence related to Stacey Maher's testimony had virtually no

23   prejudicial impact, which leaves only undisclosed evidence related to Diane Bauer.  As discussed

24   above, that evidence cannot "reasonably be taken to put the whole case in such a different light as to

25   undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435.

26   Likewise, with respect to the penalty phase, the evidence taken as whole, factoring in

1   undisclosed evidence, establishes beyond a reasonable doubt that Sherman committed the 1981

2   robbery and murder of the grocery store clerk in Idaho and was deeply involved in a plan to escape

3   from jail, which included solicitation to commit murder.  The undisclosed evidence would have, at

4   most, allowed Sherman to show that his role in those activities was marginally diminished as

5   compared to that portrayed by the evidence presented at trial.  Such evidence was not enough to

6   create a reasonable probability of a different outcome.

7          Finally, Sherman's claim based on *Napue v. Illinois*, 360 U.S. 264 (1959), also fails.  In

8   *Napue*, the Court held that the knowing use of false or perjured testimony against a defendant to

9   obtain a conviction is unconstitutional.  *Napue*, 360 U.S. at 269.  A claim under *Napue* will succeed

10  when "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have

11  known that the testimony was actually false, and (3) the false testimony was material."  *Hayes v.*

12  *Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (internal quotation marks and citation omitted).

13  Materiality under *Napue* is established if there is "any reasonable likelihood that the false testimony

14  could have affected the judgment of the jury."  *Id.* (citing *Bagley*, 473 U.S. at 678; internal quotation

15  marks omitted).

16         According to Sherman, the *Napue* violations consist of Dianne's testimony about contacting

17  the authorities to warn them that her father was in danger, Hammack's testimony about benefits

18  provided to Placencia by the State, and Anderson's testimony about the Idaho murder.  Sherman has

19  not made a convincing showing that all three of the *Napue* elements apply to any of this testimony.

20         Claim Three is denied.

21                      **Claim Nine**

22         In Claim Nine, Sherman alleges that his conviction and sentence are unconstitutional because

23  the trial court  failed to properly instruct the jury as to the elements of first-degree murder.  The

24  claim focuses on the jury instructions on premeditation and implied malice.  According to Sherman,

25  the premeditation instruction blurred the distinction between first and second degree murder, while

26  the implied malice instruction invaded the truth-finding task that is in the sole province of the jury

and a created a mandatory presumption as to an essential element of the charged crime. Sherman

argues that the instructions were unconstitutionally vague and relieved the State of its burden of

proof on essential elements of first degree murder and, but for the improper instructions, there is a

reasonable probability the jury would have returned a different verdict.

The instruction on "premeditation and deliberation" that Sherman claims was defective read

as follows:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

ECF No. 129-17, p. 14.

The Nevada statutes define first degree murder, in relevant part, as a "willful, deliberate and

premeditated killing." Nev. Rev. Stat. § 200.030(1)(a). The use of the challenged instruction was

condoned by the Nevada Supreme Court in *Kazalyn v. State*, 825 P.2d 578 (Nev. 1992), and is

commonly referred to as the *Kazalyn* instruction. Eight years after *Kazalyn*, the Nevada Supreme

Court ruled, in *Byford v. State*, 994 P.2d 700 (Nev. 2000), that the instruction was deficient because

it defined only premeditation and failed to provide an independent definition for deliberation. *See*

*Byford*, 994 P.2d at 713.

In *Polk v. Sandoval*, 503 F. 3d 903 (9th Cir. 2007), the court held that the *Kazalyn* instruction

violates due process because it relieves the State "of its burden of proving every element of

first-degree murder beyond a reasonable doubt." *Polk*, 503 F. 3d at 909. In *Babb v. Lozowsky*, 719

F.3d 1019 (9th Cir. 2013), however, the court determined that its holding in *Polk* regarding the

constitutionality of the *Kazalyn* instruction is no longer good law in light of the intervening Nevada

Supreme Court decision in *Nika v. State*, 198 P.3d 839 (Nev. 2008), which explained "that *Byford*

represented a change in, rather than a clarification of, [Nevada] law." *Babb*, 719 F.3d at 1029.

1   Thus, in cases (like Sherman's) in which the conviction was final prior to the *Byford* decision, due

2   process did not require independent definitions for premeditation and deliberation because, prior to

3   *Byford*, they were not separate elements of the *mens rea* necessary for first degree murder.  *See id.*[9]

4          Even so, Sherman advances arguments why *Babb* does not foreclose relief in this case.  First,

5   he contends that the holding in *Babb* was dicta and that *Polk* still controls his case because his

6   conviction was final before the issuance of *Byford*.  This argument is not persuasive.  The question

7   of whether the instruction amounted to a constitutional violation of the type Sherman alleges here

8   was squarely before the court in *Babb*; and, the court unequivocally concluded that it did not.  *See*

9   *Babb*, 719 F.3d at 1029–30 ("There is no constitutionally mandated definition of premeditation or

10  deliberation, and whether these are independent elements with distinct meanings is a question of

11  state law.").

12         Sherman also argues that *Nika* does not impact his argument that the challenged instruction

13  runs afoul of *Sandstrom v. Montana*, 442 U.S. 510 (1979), because *Nika* does not address the fact

14  that the *Kazalyn* instruction, by requiring merely the intent to kill, fails to distinguish first degree

15  murder from second degree murder.  The Nevada Supreme Court in *Byford* conceded that Nevada's

16  jurisprudence on this issue had been inconsistent and that *Greene v. State*, 931 P.2d 54 (1997), by

17  "reduc[ing] premeditation and deliberation to simply 'intent,'" completely erased the distinction

18  between the two crimes.  *Byford*, 994 P.2d at 713.  Even so, the jury instruction above and Nevada

19  case law in general (*Greene* notwithstanding), even in the period between *Kazalyn* and *Byford*,

20  recognized that premeditation denoted a *mens rea* beyond the mere intent to kill – i.e. a decision to

21  kill, *distinctly formed in the mind*, prior committing the act rather than a rash impulse to kill.  *See*

22  *Powell v. State*, 838 P.2d 921, 927 (Nev. 1992) (citing *Briano v. State*, 581 P.2d 5, 7 (1978), where

23

24         [9] *Babb* also held that it is a violation of due process to not use the new instructions announced
   in *Byford* in cases in which the conviction was not final at the time of the *Byford* decision.  *Babb*, 719
25  F.3d at 1032.  That holding has since been limited by *Moore v. Helling*, 763 F.3d 1011 (9th Cir. 2014),
   which held that, due to the Supreme Court's intervening decision in *White v. Woodall*, 134 S. Ct. 1697
26  (2014), *Babb* is no longer good law with respect to defendants whose convictions became final prior to
   *Bunkley v. Florida*, 538 U.S. 835 (2003).

1   the court stated, "[T]he state must prove that a design to kill was distinctly and rationally formed in

2   the mind of the perpetrator, at or before the time the fatal blows were struck.").

3          In addition, Sherman argues that *Nika* itself violates his due process rights because "the court

4   retroactively re-characterized its initial characterization of state law in order to evade federal review

5   of the *Kazalyn* instruction."  ECF No. 210, p. 96.  However, states are free to define the elements of

6   state crimes.  *Apprendi v. New Jersey*, 530 U.S. 466, 484-87 (2000); *McMillan v. Pennsylvania*, 477

7   U.S. 79, 84-86 (1986).  And, Sherman's disagreement with *Nika* notwithstanding, this court is bound

8   by the holding in *Babb* with respect to pre-*Byford* cases involving the *Kazalyn* instruction.

9   Moreover, even if the *Nika* decision was influenced by *Polk*, the Nevada Supreme Court did not

10  contravene clearly established U.S. Supreme Court precedent in not granting Sherman relief based

11  on the premeditation instruction.  Thus, this court must defer to the decision in accordance with §

12  2254(d).

13         Finally, Sherman contends that, because *Byford* narrowed the scope of Nevada's first degree

14  murder statute, it is a violation of the Due Process Clause to not apply it to him.  There is no

15  authority, however, for the position that *Byford* must be applied retroactively.  Indeed, until *Bunkley*,

16  no Supreme Court case had held that a change in state law that narrows the scope of a criminal

17  statute must, as a matter of due process, be applied to convictions that are *not yet final*.  *See Moore*,

18  763 F.3d at 1018.

19         The instruction on implied malice that Sherman challenges stated as follows:

20              Express malice is that deliberate intention unlawfully to take away the life of a
            fellow creature, which is manifested by external circumstances capable of proof.

21

22              Malice may be implied when no considerable provocation appears, or when all
            the circumstances of the killing show an abandoned or malignant heart.

23  ECF No. 129-17, p. 12.

24         As an initial matter, Sherman's petition misquotes the instruction to read that malice "shall

25  be implied," rather than "may be implied."  ECF No. 103, p. 278.  Beyond that, Sherman's claim

26  based on this instruction is without merit because, regardless of whether the instruction is lacking in

1   a general sense, there is no reasonable likelihood that the jury applied it in a way that violated

2   Sherman's constitutional rights.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (noting that a

3   suspect jury instruction must be considered in the context of the instructions as a whole and the trial

4   record and that, in reviewing an ambiguous instruction, the court shall inquire whether there is a

5   reasonable likelihood that the jury has applied the instruction in a way that violates the Constitution).

6   Because the jury in Sherman's case found him guilty of first degree murder, there was no need for it

7   to rely upon the implied malice instruction in reaching its verdict.  *Scott v. State*, 554 P.2d 735, 738

8   (Nev. 1976).

9          Claim Nine is denied.

10          **Claim Eleven**

11          In Claim Eleven, Sherman alleges that his death sentence is in violation of his constitutional

12   rights because the Nevada Supreme Court erred in re-weighing aggravating and mitigating

13   circumstances after invalidating two statutory aggravating circumstances and failed to perform a

14   constitutionally-adequate harmless error analysis.  In Sherman's second state post-conviction

15   proceeding, the Nevada Supreme Court invalidated the robbery and burglary circumstances

16   pursuant to *McConnell v. State*, 102 P.3d 606 (Nev. 2004).[10]  The Nevada Supreme Court

17   determined that Sherman had established good cause to overcome procedural bars to his *McConnell*

18   claim, but that the requisite showing of prejudice was lacking.

19          Here is the relevant passage:

20          Sherman contends that the district court erred by denying his claim that he was
     entitled to a new penalty hearing because the burglary and robbery aggravators found
21   for the murder must be stricken pursuant to McConnell and the jury's consideration of
     those invalid aggravators was not harmless.  We conclude that Sherman can show
22   good cause because McConnell is retroactive, Bejarano v. State, 122 Nev. 1066,
     1070, 1076, 146 P.3d 265,268, 272 (2006).  However, he failed to show prejudice.

23
          After invalidating the felony aggravators, two aggravators remain – (1)
24   Sherman had been previously convicted of another murder and (2) he committed the

25   _____

26          [10]  In *McConnell*, the Nevada Supreme Court ruled that it is "impermissible under the United
     States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the
     felony upon which a felony murder is predicated."  *McConnell*, 102 P.3d at 624.

murder while under sentence of imprisonment.

To support the aggravators, the State established that Sherman had been previously convicted of another murder in1982.  In that incident, Sherman, 17 years old at the time, hid in the men's bathroom of a small grocery store, waiting for the owner to close the store. While the owner was locking up, Sherman jumped out of the men's bathroom and fired three shots at the owner, killing him.  To support the under-sentence-of-imprisonment aggravator, the State presented evidence that at the time Sherman killed Dr. Bauer, he was on parole for the 1982 murder.  See Geary v. State, 110 Nev.261, 266-67, 871 P.2d 927, 930-31 (1994); Jones v. State, 107 Nev. 632, 636, 817 P.2d1179, 1182 (1991).

In mitigation, Sherman offered evidence that he was under the influence of alcohol and controlled substances at the time of the murder, had been raised in an extremely dysfunctional family, suffered sexual abuse by his mother and an older brother, experienced extensive drug and alcohol abuse as a youth, and that Dianne had exerted a controlling influence over him.  Family members and friends described Sherman as polite, obedient, loving, and a talented classical pianist and expressed their love for him.  Additionally, Sherman had developed a program in prison to teach illiterate inmates how to read and an anti-rape program focused on  protecting new, young inmates from older, stronger prisoners.  Sherman made a statement in allocution, expressing his love for his family and describing his actions as deplorable. He also apologized for the pain he caused to his family as well as the Bauer family.

The compelling evidence supporting the remaining aggravators juxtaposed to the mitigation evidence, albeit credible, persuades us to conclude the jury would have found Sherman death eligible absent the invalid aggravators.  Sherman's callous shooting murder of a grocery store owner, although committed when he was 17 years old, shows his penchant for violence, which culminated in yet another brutal murder – the beating death of Dr. Bauer.  And although the under-sentence-of-imprisonment aggravator arises from the prior murder, Sherman's actions suggest that he remains a danger to others and unaffected by other forms of punishment.

In addition to the aggravators, the State produced evidence concerning four instances of misconduct while Sherman was incarcerated for the instant offenses. First, a correctional officer explained that during a search of Sherman's cell on October 25, 1995, he discovered a shank hidden inside Sherman's mattress.  Second, on October 10, 1996, Sherman threatened a correctional officer with violence.  Third, several witnesses described an elaborate plan Sherman hatched to escape from prison, which included the killing of four individuals.  Fourth, a correctional officer testified that on October 17, 1996, he overheard Sherman threaten violence against other correctional officers.

Considering the brutal nature of the murder and Sherman's character and history, particularly his proclivity for violence in and out of prison, we conclude that the jury would have imposed death.

Because Sherman failed to demonstrate prejudice to overcome the procedural default to his McConnell claim, the district court did not err in this regard.  [Fn: We reject Sherman's claim that the McConnell error was not harmless in light of other constitutional errors this court concluded on direct appeal did not warrant relief.]

1    ECF No. 140-12, p. 7-10 (one footnote omitted).

2         Sherman argues that the Nevada Supreme Court contravened the requirements of *Clemons v.*

3    *Mississippi*, 494 U.S. 738, 741 (1990), by engaging in independent fact-finding in relation to "non-

4    statutory aggravating circumstances" and by failing to recognize the three mitigating circumstances

5    found by the jury.  And, with respect to the latter, Sherman argues that, because the jury found "other

6    mitigating circumstances" without specifying what those were, the state appellate court could not re-

7    weigh under *Clemons* without considering all the mitigating evidence.  He further argues that the

8    court did not conduct the "close appellate scrutiny" *Clemons* and its progeny require.

9         As a general matter, when an aggravating circumstance is invalidated, a reviewing court

10   may, short of remanding for re-sentencing, either re-weigh the mitigating evidence against the

11   remaining aggravating factors or determine whether the sentencer's consideration of the invalid

12   factor or factors was harmless error.  *Clemons*, 494 U.S. at 741.  In condoning the use of the re-

13   weighing by the state appellate court, the Court in *Clemons* stated:

14              We see no reason to believe that careful appellate weighing of aggravating
               against mitigating circumstances in cases such as this would not produce "measured
15             consistent application" of the death penalty or in any way be unfair to the defendant.
               It is a routine task of appellate courts to decide whether the evidence supports a jury
16             verdict and in capital cases in "weighing" States, to consider whether the evidence is
               such that the sentencer could have arrived at the death sentence that was imposed.

17

18   *Clemons*, 494 U.S. at 748–49.  The Court also held that an appellate court is able to adequately

19   assess any evidence relating to mitigating factors such that the re-weighing process can survive

20   constitutional scrutiny where the appellate court is "without the assistance of written jury findings."

21   *Id*. at 750.  However, the state appellate court must closely scrutinize "the import and effect of

22   invalid aggravating factors," by "determin[ing] what the sentencer would have done absent the

23   factor[s]."  *Stringer v. Black*, 503 U.S. 222, 230 (1992).

24        Despite Sherman's arguments to the contrary, the Nevada Supreme Court did not deviate

25   from United States Supreme Court precedent in re-weighing the aggravating circumstances against

26   mitigating circumstances in his case.  The Nevada Supreme Court's failure to list the specific

1   mitigating circumstances found by the jury does not mean that the court overlooked them in its re-

2   weighing analysis or that the re-weighing was otherwise invalid.  *See Clemons*, 494 U.S. at 750 ("An

3   appellate court also is able adequately to evaluate any evidence relating to mitigating factors without

4   the assistance of written jury findings.").  In fact, the court's decision indicates that the court

5   considered *all* of Sherman's mitigating evidence.

6          With respect to the Nevada Supreme Court consideration of "non-statutory aggravating

7   circumstances," the excerpt above shows that the court factored in those circumstances only after

8   concluding that the jury would have found Sherman "death eligible" based on the two valid statutory

9   aggravators.  That is, the Nevada Supreme Court considered  evidence supporting non-statutory

10   aggravating factors in determining that the jury would have selected the death sentence.  This is

11   consistent with accepted principle that, upon finding the defendant eligible for the death penalty, the

12   jury is "free to consider a myriad of factors to determine whether death is the appropriate

13   punishment." *California v. Ramos*, 463 U.S. 992, 1008 (1983).  There is no Supreme Court

14   authority that prohibited the Nevada Supreme Court from considering aggravating evidence

15   presented to the jury that did not necessarily support one of statutory aggravating circumstances

16   found by the jury.

17          In addition, the court's detailed recounting of the evidence presented at the penalty hearing

18   combined with its conclusions that "the jury would have found Sherman death eligible absent the

19   invalid aggravators" and "the jury would have imposed death" show that the court conducted the

20   "close appellate scrutiny" contemplated by *Stringer*.  Finally, there is also no support in Supreme

21   Court case law for Sherman's argument that the Nevada Supreme Court's re-weighing analysis was

22   defective because it failed to consider additional mitigating evidence presented in state post-

23   conviction proceedings.

24          For the foregoing reasons, the Nevada Supreme Court's re-weighing of aggravating and

25   mitigating circumstances after invalidating two statutory aggravating circumstances did not violate

26   Sherman's constitutional rights.  Claim Eleven is denied.

1          **Claim Thirteen(B)**

2          In Claim Thirteen(B), Sherman claims that his death sentence is unconstitutional because the

3   trial court's anti-sympathy jury instruction in the penalty phase of his trial effectively negated the

4   constitutional mandate that all mitigating evidence be considered.  Sherman cites to *California v.*

5   *Brown*, 479 U.S.538 (1987), and argues that, although the court may instruct a jury to base its

6   determination on mitigating or aggravating evidence and not "mere sympathy," it cannot, as a

7   constitutional matter, prevent the jury from considering sympathy altogether.

8          The Nevada Supreme Court addressed this claim in deciding Sherman's direct appeal:

9               Sherman argues that the district court erred by instructing the jury, during the
      penalty phase, that "[a] verdict may never be influenced by sympathy, prejudice, or
10    public opinion."  Sherman argues that this instruction "violated [his] Eighth
      Amendment rights because it undermined the jury's constitutionally mandated
11    consideration of mitigating evidence."

12              This court has recently held that "[a] district court may instruct the jury not to
      consider sympathy during a capital penalty hearing, as long as the court also instructs
13    the jury to consider mitigating facts."  *Rippo v. State*, 113 Nev. 1239, 1262, 946 P.2d
      1017, 1032 (1997) (citing *Riley v. State*, 107 Nev. 205, 215-16, 808 P.2d 551, 557
14    (1991)).

15              In this case, the court instructed the jury to consider mitigating factors.
      Therefore, we conclude that the anti-sympathy instruction was proper.

16

17   *Sherman*, 965 P.2d at 912.

18          Sherman's *Brown*-based argument is unavailing.  Indeed, the Supreme Court rejected the

19   same argument in *Saffle v. Parks*, 494 U.S. 484 (1990):

20              Parks' argument relies upon a negative inference:  because we concluded in
      *Brown* that it was permissible under the Constitution to prevent the jury from
21    considering emotions not based upon the evidence, it follows that the Constitution
      requires that the jury be allowed to consider and give effect to emotions that are based
22    upon mitigating evidence.  For the reasons discussed above . . . , we doubt that this
      inference follows from *Brown* or is consistent with our precedents.  The same doubts
23    are shared by the clear majority of federal and state courts that have passed upon the
      constitutionality of antisympathy instructions after *Brown*.

24

25   *Saffle*, 494 U.S. at 494.  This holding precludes this court from concluding that the Nevada Supreme

26   Court's adjudication of Sherman's claim was contrary to, or involved an unreasonable application of,

32

1    clearly established Supreme Court precedent.

2              Claim Thirteen(B) is denied.

3                          **Claim Fourteen**

4              In Claim Fourteen, Sherman alleges that his sentence is unconstitutional because the State

5    used, as a statutory aggravating circumstance, a prior murder conviction for a murder committed by

6    Sherman before the age of eighteen.  Sherman relies upon *Roper v. Simmons*, 543 U.S. 551 (2005),

7    which holds that the death penalty for juvenile offenders is cruel and unusual punishment.

8              The Nevada Supreme Court refused to extend *Roper* to find a constitutional prohibition

9    against using Sherman's juvenile murder conviction as an aggravating circumstance.  ECF No. 140-

10   12, p. 8.  That adjudication was not was contrary to, nor did it involve an unreasonable application

11   of, clearly established Supreme Court precedent.  *See Williams v. Norris*, 576 F.3d 850, 870 (8th Cir.

12   2009) (noting "the obvious difference between executing a juvenile and considering conduct as a

13   juvenile in determining whether an adult warrants the death penalty").

14             Claim Fourteen is denied.

15             IV.  CONCLUSION

16             For the reasons set forth above, Sherman is not entitled to habeas relief.

17                          *Certificate of Appealability*

18             Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing Section

19   2254 Cases requires this court to issue or deny a certificate of appealability (COA).  Accordingly, the

20   court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a

21   COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

22             Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

23   substantial showing of the denial of a constitutional right."  With respect to claims rejected on the

24   merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

25   assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484

26   (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA

1   will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the

2   denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

3          The COA standard is not high.  Sherman must only "'sho[w] that reasonable jurists could

4   debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement to

5   proceed further.'"  *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations

6   omitted).  Having reviewed its determinations and rulings in adjudicating Sherman's petition, the

7   court finds that the *Slack* standard is met with respect the court's resolution of Claim One.  The court

8   therefore grants a certificate of appealability as to that issue.  The court declines to issue a certificate

9   of appealability for its resolution of any procedural issues or any of Sherman's other habeas claims.

10          **IT IS THEREFORE ORDERED** that petitioner's second amended petition for writ of

11   habeas corpus (ECF No. 103) is DENIED.  The Clerk shall enter judgment accordingly.

12          **IT IS FURTHER ORDERED** that a Certificate of Appealability is issued as to the court's

13   resolution of Claim One.

14          DATED this 16th day of December, 2015.

15

16                                                   _____

17                                                   LARRY R. HICKS
                                                     UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26